RosALíA SÁNCHEZ, ET ALS., Plaintiffs, Appellants and Appellees, *v.* MARGARITA SÁNCHEZ, ET ALS., Defendants, Appellees and Appellants. SAME, Plaintiffs, Appellees and Appellants, *v.* SAME, Defendants, Appellants and Appellees.

Nos. 7478 and 7479.    Argued February 6, 1941.—Decided April 30, 1941.

*Arturo Aponte,* for plaintiffs, appellants and appellees. *Joaquín Vendrell,* for defendants, appellees and appellants.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

This is only one case. The plaintiffs appealed from the judgment rendered in the same and so did the defendants, separately, but the briefs filed are common to both appeals. We shall commence by considering the appeal taken by defendants.

The suit arose between members of a family. Four living brothers and thirteen children of four deceased brothers sued the six children of another deceased brother claiming an undivided interest on real estate, rendition of accounts and distribution of rentals, all with relation to a certain urban property, their only inheritance from their ancestor Juana Montañez widow of Sánchez.

The plaintiffs alleged that Doña Juana was the owner, until the moment of her death on May 4, 1923, of said property, composed of a lot 16 meters wide by 17 meters long, located in Santa Rosa Street in the City of Humacao, with a masonry house with zinc roof, twelve meters wide by seventeen meters in depth, with a bakery oven, and used as a bakery.

That some years before her death, Doña Juana borrowed $2,000 from Wifredo Bertrán. That she secured the debt by mortgage on the property, which mortgage was finally recorded in favor of Bertrán's widow, Margarita Picornell.

That when the debt became due after Doña Juana's death, the mortgagee claimed payment in the courts and the auction sale of the mortgaged property was set for December 28, 1929.

That the herein plaintiff Félix Sánchez, and Esteban Sánchez, the father of the defendants, spoke with the other heirs of Doña Juana and they agreed that the house should be sold at auction and adjudicated to Félix or to Esteban for $2,500 which was the amount of the debt, with interest and costs; that Félix would provide $1,000 and Esteban $1,500, it being agreed that the purchaser would then convey the property to all the heirs, deducting the money furnished, and that the property was in fact sold and adjudicated to Esteban under the aforesaid conditions.

That after the property was adjudicated to Esteban, it was agreed that Félix and Esteban would retain possession of the property for a monthly rental of $100 which they would charge off to the $2,500 they had furnished and after that sum had been paid in that manner, the property would be divided among all the heirs; and that when the property was being repaired so that the brothers Félix and Esteban could use it and collect their money therefrom, Esteban became suddenly ill and died on May 8, 1930, before the agreement was fulfilled, and that the property remained at the disposal of the parties, and that notwithstanding that the defendants, Esteban's heirs, had knowledge of the truth of all these happenings, they took material possession of the property on January 26, 1931, alleging to be full owners thereof, and that they leased a part thereof, collecting the rentals and refusing to distribute them and to divide the property—which has a value of $8,000—among themselves and the plaintiffs.

The defendants demurred on the ground that the complaint was ambiguous and unintelligible. The demurrer was overruled and they answered. In brief, they denied that the adjudication of the property to their father was made under

any agreement and they alleged to be full owners of the aforesaid property by inheritance of their father Esteban.

The case came to trial and the court decided it by a judgment which contains the following findings: 1, that the house object of the suit belongs in common *pro indiviso* to plaintiffs and defendants in the proportion that each one may have as heirs of Juana Montañez widow of Sánchez; 2, that all the heirs owe, in proportion to their interest, the moneys which two of them provided, Félix Sánchez, $1,000 and Esteban Sánchez, $1,500, and legal interest thereon since December 28, 1929, date of the auction sale of the house in question; 3, that to plaintiffs and defendants belong everything that the house may have produced since January 24, 1931, when the defendant succession took possession of it, and also what may have been produced from the date of the auction until they took possession. From those rents, the amounts owing to Félix and Esteban will be paid and the remainder will belong to the heirs in the proportion that may pertain to them as such heirs, and 4, that the costs of the suit, including a reasonable amount for attorney's fees, will be paid by the defendants.

The brief charges eleven errors to the trial court, the first three in allowing the witnesses González Fagundo, López del Valle and Ignacio de Jesús to testify as to statements made to them by two of the plaintiffs and as to transactions had with the deceased, the defendants' father; the fourth one in refusing to strike out said testimony; the fifth, sixth, seventh and eighth in allowing the witnesses Agustín Díaz, Félix Sánchez and Rafael Mas to testify as to said statements and transactions, and the last one as to the manner of payment of the taxes on the property in issue; the ninth in appraising the evidence, moved by bias, prejudice and partiality; the tenth in rendering judgment with the knowledge that one of the plaintiffs had died, and the eleventh in imposing costs and attorney's fees.

The eighth assignment of error is not argued by the appellants in their brief. The first seven are argued jointly and we shall thus consider them, commencing by setting forth separately what happened on each occasion.

Francisco González Fagundo, attorney and notary, testified that he knew Esteban Sánchez and knows Margarita Sánchez and that he was and is their close friend; that before the auction of the house, he had a conference with Félix, Esteban and Manuel Sánchez with the purpose of obtaining money for the auction; that Esteban sold a house to Providencia Ramírez for $1,000.

The defendants' attorney objected alleging that that sale was immaterial to the issue involved. The plaintiffs' attorney argued at length. The court decided that the witness could testify. The defendants took exception.

The witness went on saying that Félix Sánchez had some mortgage notes and he sold them to raise funds, $1,000. The defendants objected because the agreement alleged in the complaint had not yet been proved and the court admitted the evidence over their objection.

He went on stating that on the day set for the auction before it took place, Félix, Esteban and Manuel Sánchez went to his office and argued as to who should acquire the property, it being agreed at first that it should be Manuel who was single and had no debts, but then they changed their minds and Esteban did it.

"Q. By the conversation had, do you know if Esteban Sánchez was going to take the property for Esteban Sánchez or for other people?

"A. For all; for the group.

"Q. For the whole succession?

"A. Yes, sir.

"Q. For whose succession?

"A. That of Doña Juana Montañez.

"Attorney Vendrell: We object to all this, the witness is going into a wholly different field.

"Witness: With the agreement that the money would be returned to Don Félix as well as to Don Esteban.

"Attorney Vendrell: All this is immaterial.

"Judge: Do you object to this statement, that is, that it was for the community, acknowledging the rights of each one as to the amount furnished by each one?

"Attorney Vendrell: We allege that it is immaterial because the witness is testifying as to certain points which have no relation with the facts alleged in the complaint.

"Judge: The court will appraise the evidence now and as a whole later.

"Attorney Vendrell: With our exception."

The witness José López del Valle, attorney, registrar of property, close friend of both parties and brother-in-law of the plaintiff Félix, said that he had knowledge of the steps Félix and Esteban were taking to raise the money to pay the mortgage; that they asked his advice and he advised that "to avoid the red tape of many declarations of heirship, because this was a very large succession . . . they should go ahead with the foreclosure . . . and at the auction one of them two should buy it, and that he who bought it" should divide it among all.

The defendants objected to the evidence "because it was immaterial and also hearsay." The court admitted the evidence and the defendants took exception. He further testified that "he took some time off" to go to the auction and there "Esteban Sánchez says to me: 'Pepe, don't you think it is the same if the house should be put in my name?', and I said to him: 'I think that to all of you it is the same'. I called Félix and told him: 'Esteban says that the house be put in his name' and Félix said: 'It is the same to put it in his name'. That he knows about the money paid at the auction sale because he was present at the same until it was finished; that Esteban Sánchez paid $2,500; that he does not know how the money was raised; that the witness had no intervention with the money . . . That the agreement was . . . that after the property was adjudicated to one

of them, with the rents produced by the house, so that they would suffer no loss, they would take possession of the house by lease and from the rents of the house they would collect their money; Esteban Sánchez would collect his $1,500 and Félix Sánchez $1,000, and after the property was cleared, when nothing was owed, it would then be divided in the proportion which fell to each one. That the property was going to be divided between the nine heirs of Juana Montañez.''

The defendants, by their attorney, without objecting to the last part of the witness's statement, cross-examined him, obtaining the following answers:

''That the statements as to the manner in which the property was to be adjudicated were made in different places; the first time that they discussed what they wanted to do it was in the witness's office but that both came in to ask the witness whether there was danger in doing so and I told them in the negative, that there was no danger in that the possession of the property should be adjudicated to one of them; that the witness did not advise them to make everything clear in a public document, because he had no knowledge that between the two of them anything had ever happened with these relatives; that the witness had knowledge of who composed the succession in all its branches.

''Q. Did you have knowledge as to whether the agreement had also come to their knowledge?

''A. Whose knowledge?

''Q. All the rest besides Félix and Esteban Sánchez.

''A. And Manuel who was with them, and they were speaking in the name of all. Since what was going to be done was for the benefit of all I did not think it necessary to set forth the agreement in any document notwithstanding that there was a large succession with its respective branches; . . .

''Q. So that they were graciously going to give, the one $1,000 and the other $1,500, to protect the property to the benefit of all other parties?

''A. To their benefit as brothers and for that which belonged to all the relatives.

''Q. Did they not explain to you in what manner Félix Sánchez would recover that $1,000 and Esteban Sánchez the $1,500?

"A. Those thousand dollars and the $1,500 were to be collected from the rents produced by the building.

"Q. Was the bakery under lease?

"A. I do not know if the bakery was under lease, I know there was a store in the same building too.

"Q. Don't you know who owned that store?

"A. No, I think it is that same man over there, one Sixto.

"Q. What is the rental of that house?

"A. The least that a bakery rents here in Humacao is $100.

"Q. But you did not know whether or not it was under lease?

"A. And that one also has a place where there is a store which pays $25 a month.

"Q. But was it or not under lease at the time?

"A. I do not know.

"Q. Do you know the house?

"A. I know it.

"Q. Did they agree, in your presence, anything as to the matter of the expenses for repairs to those buildings?

"A. No, they did not agree as to that before me.

"Q. Did they agree before you either as to who should get paid first or in what manner they would dispose of the rents?

"A. No. The purpose was to retain the house for all after the debt was paid . . ."

Ignacio de Jesús, archivist, testified that he had held a conference with Esteban, Félix and Manuel Sánchez and the following incident ensued:

"Antonio Vendrell: One moment, Your Honor. I wish that my colleague will state first what is the purpose of this witness's testimony.

"Attorney Aponte: The purpose of this witness's testimony is to show before Your Honor that by reason of a foreclosure proceeding which was being carried out by the Attorney Francisco González Fagundo in the name of Margarita Picornell against the heirs of Juana Montañez who are the plaintiffs and defendants in this action, with the exception of Doña Margarita who was the widow of Don Esteban, Esteban, Félix and Manuel came to the office of Francisco González Fagundo for the purpose of paying or arranging the payment of said mortgage credit.

"  *      *      *      *      *      *      *

"Attorney Vendrell: I am going to object that the witness testify as to this agreement or transaction had between the deceased and the defendants because the witness is estopped from testifying on that point.

"Judge: The court overrules the objection.

"Attorney Vendrell: We take exception, and before cross-examining this witness we are going to request Your Honor, for the purpose of the record, to strike out all the testimony given up to now by all the witnesses who have testified in this suit, on the ground that they are included in the provisions of the Act of March 10, 1904, as to who are competent witnesses and to repeal Section 1215 of the Civil Code.

"Judge: The court denies the motion to strike because none of these witnesses is a party to the suit. The examination may go on.

"Attorney Vendrell: Exception."

He goes on stating: "that two or three days before the auction which took place on December, 1929, Félix and Esteban Sánchez went to the witness to tell him that they had already obtained the money and that they were going to deliver it to prevent the auction sale; . . . that the witness advised Félix and Esteban Sánchez that it was not convenient for them to deliver the money and on the contrary they should let the auction sale take place because as there were four dead sons besides the mother, they would then acquire a free title without great expenses, because otherwise the declarations of heirship and other documents would cost them a great deal and it seems that they, Esteban and Félix Sánchez decided to follow the witness's advice; . . ."

The witness went on testifying as to the manner of repayment of the money furnished by Esteban and Félix and he was cross-examined at length by the defendants' attorney.

Agustín de Jesús began to testify and the following happened:

"Attorney Vendrell: He is brought to complete the chain of evidence as to the same agreement alleged in the complaint.

"Attorney Aponte: One admission more.

"Attorney Vendrell: We are then going to raise the same question as to the incompetency of the witness to testify on this point.

"Judge: The court holds the same. The same ruling.

"Attorney Vendrell: Exception.

"Judge: Because he is not a party.

"Attorney Vendrell: With our exception."

His testimony corroborates the evidence as to the agreement to auction off the house in the name of one heir for the benefit of all.

Félix Sánchez, one of the plaintiffs, testified over the opposition of the defendants that the bakery installed in the house in question was one of the best in Humacao. Examined as to the agreement for the purchase at the auction sale, the defendants objected and the court sustained the objection because he was a party to the suit.

Examined as to who remained in possession of the property after it was sold at auction, the witness answered, over the objection of the defendants which was overruled by the court, and excepted to:

"A. The heirs of Juana Montañez, and the man who had the house leased for a store, which is in the corner, paid to Rosalía Sánchez.

"Attorney Aponte: What is his name?

"A. Felipe Silva.

"  *         *         *         *         *         *         *

"Attorney Aponte: How much did Silva pay for that part which he had leased?

"A. $25.

"  *         *         *         *         *         *         *

"The witness goes on testifying that Mr. Silva still occupies the same place and that he now pays to the heirs of Esteban Sánchez.

"  *         *         *         *         *         *         *

"Attorney Aponte: Do you mean to say that before the marshal put them in possession, he paid to Doña Rosalía Sánchez, and after the marshal put them in possession, he paid to the heirs of Esteban Sánchez? Is that what you mean?

"A. Yes, sir."

With the objection and exception of the defendants he was allowed to answer that the repairs to the house were paid by the witness and Esteban.

Asked whether after the death of Esteban Sánchez he had spoken with his heirs over the matter, he answered:

"As to that matter of the debt that the heirs of Juana Sánchez had with the heirs of Esteban Sánchez, and with what he had provided for the foreclosure of the aforesaid property.

"      *      *      *      *      *      *      *

" . . . he spoke with Doña Margarita, that is, the widow of Esteban Sánchez and she demanded from the witness the payment of the $1,500 furnished by Esteban Sánchez for the property.

"      *      *      *      *      *      *      *

" . . . that when Doña Margarita demanded from him to get the $1,500, the witness answered that they would take all steps to get the money. That in view that they could not obtain the money, Doña Margarita put the matter in the hands of Francisco González Fagundo so that he would collect from the succession; that the witness has not paid the $1,500.

"      *      *      *      *      *      *      *

"That Don Francisco González Fagundo as attorney, demanded from the witness, in the name of Mrs. Margarita Fuentes, to get for her the amount of $1,500 provided by Esteban Sánchez for the property; that the witness told Attorney González Fagundo that he would get the money; that afterwards Margarita Fuentes widow of Sánchez refused to receive the money and said that she had four grown sons and that what they wanted was the house."

Rafael Mas, Marshal of the District Court, testified that the price of the auction in question was paid, $1,400 in checks and $1,100 in cash; that $1,000 came from Félix Sánchez, who delivered them to him; that Esteban paid him $1,400 in checks and $100 in cash. While he testified, the defendants' attorney said: "Let our objection and exception be noted in the record." He then cross-examined at length.

To sustain that errors one to seven were committed, appellants invoke the Act of 1904 which provides who are competent witnesses and repeals Section 1215 of the Civil Code (Acts of 1904, page 120) and the decisions of this Court in the cases of *Wilcox* v. *Axtmayer et al.*, 23 P.R.R. 319 and *De la Rosa* v. *Quevedo*, 47 P.R.R. 165. And to attack the aforesaid assignments of error, the appellees rely on

that the appellants are estopped from invoking the Act of 1904 because they did not duly take exception to the evidence in time.

In the first of the opinions cited by the appellants it was held:

"Section 3 of the Act of March 10, 1904, defining who are competent witnesses and repealing Section 1215 of the Civil Code and other laws, orders and decrees in conflict therewith, was not expressly repealed by the Law of Evidence of March 9, 1905, nor is it in conflict therewith.

"A party to an action brought in Porto Rico against the heirs or legal representatives of a deceased person based on transactions had with the latter cannot testify as a witness without first being called by the adverse party." *Wilcox v. Axtmayer et al.*, 23 P.R.R. 319.

And in the second one:

"But there was a stronger objection. When counsel for plaintiff asked permission from defendant to put plaintiff on the witness stand, he literally expressed himself as follows:

" 'Your Honor, we announce that we now offer in evidence the testimony of the plaintiff don Victorio de la Rosa, so as to give the defendant the opportunity to cross-examine him about everything that happened in the transaction in question. We are aware of the fact that we cannot use him as our witness unless the opposing party consents thereto; we now ask permission from the opposing party to have the witness testify, because otherwise Your Honor has no other alternative but to reject that testimony in accordance with the theory established in *Wilcox* v. *Axtmayer et al.*, 23 P.R.R. 319.'

"In the case cited it is held that Section 3 of an Act to define who are competent witnesses, approved in 1904, is still in force. It reads:

" 'In actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this Section shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent.'

"And if it is admitted by the plaintiff and appellee himself that he could not testify personally in relation to said point, it is clear that neither can he testify through other witnesses who would repeat what he said.

"And it is said in 22 C. J. 217:

" 'Hearsay evidence does not become admissible by reason of the fact that the declarant has left the state, or country, or is sick, or cannot be examined, or compelled to testify, or is incompetent as a witness.' " *De la Rosa v. Quevedo*, 47 P.R.R. 165, 173.

So that the farthest that the decisions upon this matter have gone in this jurisdiction is to hold that according to the aforesaid Act, none of the parties shall be allowed to testify against the other as to the transactions with or statements by the testator, intestate or ward or in suits by or against the heirs or executors or administrators of a deceased, which arise from transactions had with the latter, nor can said party do the same thing through other witnesses who refer to his own statements. Attention must be called to the fact that the syllabus of the case of *De la Rosa v. Quevedo, supra,* is more comprehensive than what the text of the opinion, in the part we have copied, allows.

Therefore, applying the rule invoked by the appellants, it must be held that although it excludes what was testified by the witnesses in relation to what was said by the plaintiffs Félix and Manuel Sánchez, it does not prevent that the statements made by their ancestor, Esteban Sánchez, against his own interest, as stated by witnesses who are not parties to the suit, may be taken into consideration by the court for its judgment.

In the case of *Lezcano v. Heirs of Sifonte,* 42 P.R.R. 387, this Court, through Mr. Associate Justice Texidor, stated as follows:

"Providencia Díaz Llenza is not one of the parties to this action; not even the legal representative of her daughter, the plaintiff, who is represented by her father with *patria potestas*. The fact that the sum involved represented a gift from herself to her daughter and had been placed to the latter's name in the savings department of the Banco

Territorial y Agrícola is fully explained, and does not render the witness a party to the action, which has been instituted, prosecuted, and brought on for trial by Patria Monserrate Lezcano.

"The decision in *Wilcox* v. *Axtmayer et al.*, 23 P.R.R. 319, cited by the appellants, does not really favor them. The question discussed and decided in that case was as to whether *a party* to an action brought against the heirs of a deceased person may testify regarding certain particulars without first being called as a witness by the adverse party. Such is not the present case."

See also the study made of this limitation in the opinion of this Court issued by Mr. Associate Justice Córdova Dávila in the case of *Colón* v. *Succesion of Tristani*, 45 P.R.R. 219.

█ There is no doubt that the statements in question would be admissible unless objected to. Deciding this question, this Court held in *Cestero* v. *Heirs of Eduardo Cestero*, 35 P.R.R. 908, 910, through Mr. Associate Justice Wolf, that:

"The appellants are mistaken in supposing that the incompetency of a witness under Section 3 of the Act of 1904 is an absolute one. The statute itself shows that it may readily be waived if the witness is called by the opposite side, and the decisions generally show that this class of incompetency, like hearsay, the statute of frauds and other numerous grounds of incompetency, can be waived."

Were the statements of González Fagundo, López del Valle and De Jesús objected to? In fact they were, but the first one because it was "immaterial" and the second one because it was "immaterial and also hearsay." The third one, at the beginning, for "estoppel", it being then that the party moved to strike them out by virtue of the Act of 1904, motion which was limited to the testimony of the first two witnesses. De Jesús went on testifying and the last part of his testimony was not objected, and we know what he answered on cross-examination. From then on, the law was invoked more or less formally and the appellants' attorney always cross-examined the witnesses.

In the case of *Fagan* v. *Lentz*, 156 Cal. 681, it was held that: "Where an objection to testimony on the ground that

it is immaterial, irrelevant, and incompetent for a specified reason is properly overruled, another ground of objection to its admissibility, which was not raised in the trial court, cannot be urged on appeal.'' Applying this rule strictly to the statements of González Fagundo and López del Valle, the Act of 1904 could not now be brought against them, but even if this were not so, there is something more which eliminates the restriction and that is the fact that when they failed to attack the greater part of the testimony which dealt with the existence and conditions of the agreement alleged in the complaint, and in entering voluntarily into the cross-examination of said testimony, the defendants abandoned their opposition and are now estopped from presenting their objections.

By the ninth error it is sustained that, in appraising the evidence, the judge was moved by bias, prejudice and partiality and that the judgment is contrary to the evidence.

From the examination we have made of the record, we do not find any trace of bias, prejudice or partiality on the part of the trial judge. From the context of his opinion it does not arise either. On the contrary, what may be observed is his desire to be right and just. He expressly stated therein that he did not take into consideration, to reach his conclusions, the evidence admitted against the Act of 1904 and the decisions of this Court, therefore going beyond the necessary limits, exception made of the testimony of the plaintiff Félix Sánchez in connection with transactions had with his deceased brother Esteban, the defendants' father.

The judge gave full credit to the testimony of González Fagundo, López del Valle and De Jesús and to the others we already know, and the truth is that, should said testimony be believed, together with the documentary evidence which demonstrated the origin of the money for the auction, obtained by the brothers Félix and Esteban in the exact manner that the witnesses state, and taking also into consideration the testimony of the defendant Félix Sánchez as to the

admissions of Margarita Sánchez not denied by her, it is not possible to conclude that the judgment is not upheld by the evidence. It is so, and very fully indeed.

■ The tenth error raises the issue of the nullity of the judgment because it was rendered with knowledge that one of the plaintiffs, Asunción Sánchez Montañez, had died after the suit had begun.

In the argument thereof, Section 69 of the Code of Civil Procedure and the case of *Hernández* v. *Hutchison*, 20 P.R.R. 484, are cited. The question was not raised in the district court. The death of said plaintiff, whose interest is entirely similar to that of the other plaintiffs, arises from certain statements made by the witness López del Valle during his testimony, not for that specific purpose; and it does not appear that the court's attention was called to it, nor that it was taken into account, or even noticed by the judge.

Under these circumstances, it seems to us that the appellants are in the right when they attack the assignment of error because the issue was not raised in the lower court. The action does not end by virtue of the party's demise and if the death in question had been brought up in time, the procedure established by the Section of the Code of Civil Procedure invoked, Section 69, could have been followed.

■ Having studied the appeal in its totality, we are in perfect condition to state that the court did not err nor abuse its discretion in imposing costs and attorney's fees to the defendants, especially when after evidence was presented as to the defendants' knowledge of the agreement and their actions under the same trying to recover the money that their father provided, it was not specifically attacked, as it could have been if Margarita Sánchez had testified and if the Attorney González Fagundo had been called to the witness stand for examination on that point.

■ Having decided the appeal filed by the defendants, we shall now study and decide that taken by the plaintiffs.

It is based on a single assignment of error, to wit, that the judgment must be modified to provide for payment of rentals from December 28, 1929, and not from January 24, 1931. It is argued by the appellants as follows:

"The plaintiffs urged in their complaint that the agreement between the parties be specifically performed, to wit: that the amounts loaned by Esteban and Félix Sánchez be paid from the rents at the rate of $100 a month following the agreement; but as the lower court did not accept the testimony of Félix Sánchez because he was a party to the suit and the law forbade it, the judgment was limited to acknowledge the debt and order its payment from the date of the auction, December 28, 1929, but LIMITED the payment of the rents to them from January 31, 1931, only. That is, that from one date to the other (a year and a month) the plaintiffs will have no rentals, notwithstanding that the property yields $100 a month for the bakery, $25 for the other space occupied by a store and we do not know how much for the part used as a dwelling (because it does not appear from the record) while they will have to pay interest for all that period of time."

We believe that the judgment should not be modified. The evidence does not clearly set up to the satisfaction of the judge what happened exactly between the date of the auction and that of the formal surrender of possession of the house to the defendants. There is in the record the indication that the rents were delivered to Rosalía, one of the plaintiffs. During this time Esteban's sudden death occurred, and originated this family controversy with the ensuing administrative complications. And that the possession by the defendants was shared or at least discussed and hindered by the plaintiffs is proven by the fact that the defendants moved the court to order the marshal to formally deliver it to them.

The defendants' liability as to the return of the property's rents to be divided in the manner established by the judgment, is only indisputable from the moment of taking possession thereof, that is, since January 24, 1931.

By virtue of the above stated, both appeals must be dismissed and the judgment appealed from affirmed in all its parts.

Mr. Justice Todd, Jr., took no part in the decision of this case.